UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------×

KENTUAN ROUSE,

        *Plaintiff*,

        *v*.

LIFE ALERT EMERGENCY RESPONSE, INC.,

        *Defendant*.

------------------------------------------------------------------------×

**16 CV 6494**

**COMPLAINT**

    Plaintiff Kentuan Rouse, by his counsel, The Harman Firm, LLP, alleges for his Complaint against Defendant Life Alert Emergency Response, Inc., as follows:

## PRELIMINARY STATEMENT

1. Plaintiff Kentuan Rouse ("Plaintiff" or "Mr. Rouse") seeks damages and costs against Defendant Life Alert Emergency Response, Inc. ("Defendant" or "Life Alert") for discriminating against him based on his race (Black) by subjecting him to a hostile work environment and retaliating against him by, among other things, terminating his employment. Defendant's conduct violates Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981, and the New York City Human Rights Law ("NYCHRL"), N.Y. Admin. Code §§ 8-101 to 14-151.

2. In addition, Defendant failed to pay Plaintiff his earned commissions, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 – 219, and New York State Labor Law ("NYLL").

## JURISDICTION AND VENUE

3. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over Plaintiff's claims, as Defendant violated Plaintiff's rights under Section 1981 and the FLSA.

4. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's claims brought under the NYCHRL and NYLL, as the federal claims arise from the same set of operative facts as the state and local claims and form part of the same case or controversy.

5. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

## TRIAL BY JURY

6. Plaintiff respectfully requests a trial before a jury.

## PARTIES

7. Plaintiff, at all times relevant hereto, was and is a resident of Queens County in the State of New York.

8. Upon information and belief, at all times relevant hereto, Defendant was and is a corporation organized under the laws of the State of California with its principal place of business located in Los Angeles County in the State of California.

## STATEMENT OF FACTS

9. On or about March 1, 2016, Mr. Rouse was hired as a Sales Representative by Life Alert.

10. Mr. Rouse worked at Life Alert's facility located at 475 Park Avenue South, New York, NY 10016.

11. Mr. Rouse received training in the Sales Representative position from Life Alert. Out of the approximately eight (8) trainees in his class, Mr. Rouse was the only Black trainee.

12. Mr. Rouse began working as a Sales Representative for Life Alert on or about March 7, 2016.

13. On or about March 16, 2016, Mr. Rouse was at work on a call with a potential customer.

14. Two of Mr. Rouse's coworkers, known only to Mr. Rouse as "George" and "Elizabeth," began having a conversation in the entryway to Mr. Rouse's workspace; the substance of their conversation was that Barack Obama was a bad president and that Donald Trump needed to be elected.

15. Elizabeth then stated that they "needed to get that Black guy out of the office."

16. George and Elizabeth's conversation was so disruptive that the potential client with whom Mr. Rouse was speaking complained to Mr. Rouse about the noise.

17. Mr. Rouse asked George and Elizabeth to lower their voices or move away from his workspace, but George and Elizabeth refused to do so.

18. Mr. Rouse apologized to the potential customer and finished the call.

19. Shortly after finishing the call with the customer, Mr. Rouse received a personal call from a family member.

20. As George and Elizabeth were still speaking loudly in the entryway to Mr. Rouse's workspace, Mr. Rouse once again asked them to lower their voices or leave his office.

21. Elizabeth responded, "Go fucking downstairs and have your conversation."

22. Mr. Rouse was shocked and offended by Elizabeth's conduct and attempted to leave his workspace to finish the call.

23. George and Elizabeth continued to stand in the doorway, obstructing Mr. Rouse's ability to leave his office.

24. Once Mr. Rouse managed to get past George and Elizabeth and exit his office, Elizabeth said, "I don't know who these niggers think they are…This is why these niggers don't stay around here too long."

25. Mr. Rouse was deeply offended by the hostile and overtly discriminatory comments, which were made within earshot of other Life Alert employees.

26. The next day, on or about March 17, 2016, Mr. Rouse encountered George in the office on his way to his workspace.

27. Mr. Rouse introduced himself to George and explained how George and Elizabeth's loud conversation in his workspace the previous day had inconvenienced him. In addition, he raised the issue of Elizabeth's offensive, racist comments about "niggers."

28. George claimed not to remember any details about what had happened.

29. Later that day, Mr. Rouse met with Audrey Landau, a member of Life Alert's Human Resources ("HR") Department, and his manager, known only to Mr. Rouse as "Gabi." Mr. Rouse provided Ms. Landau and Gabi with a detailed complaint describing the racist statements that Elizabeth had made, and he was told that Life Alert would investigate the matter.

30. Later that same day, on or about March 17, 2016, Gabi sent him home for the day for "precautionary reasons."

31. Life Alert called security to escort Mr. Rouse out of the building, humiliating Mr. Rouse in front of his coworkers.

32. Life Alert then instructed Mr. Rouse to sign a form waiving his right to bring legal action against Life Alert.

33. When Mr. Rouse refused to do so, Life Alert indicated that their "investigation" would continue.

34. After Mr. Rouse's complaint of race discrimination, he began to receive fewer leads and opportunities through Life Alert's computer system.

35. Moreover, what leads and opportunities he did receive had often already been called by other Life Alert Sales Representatives and therefore declined to enroll.

36. Mr. Rouse and all Life Alert Sales Representatives depend on these leads and opportunities to generate sales. The decrease in Mr. Rouse's leads and opportunities led to a corresponding reduction in his sales.

37. Other Sales Representatives did not experience a reduction in the amount or quality of leads and/or opportunities at the time in question.

38. Mr. Rouse complained to Gabi about the quality and quantity of the leads and opportunities he was receiving, yet his complaint was never addressed.

39. Mr. Rouse was also treated less favorably than white Sales Representatives in other ways.

40. For example, many Sales Representatives at Life Alert send texts to potential customers to engage them. Other Sales Representatives were permitted to use text messages to solicit business, while Mr. Rouse was reprimanded for doing so.

41. Other Sales Representatives were allowed to work weekend shifts and were given the prime working hours of 7 p.m. to 9 p.m., while Mr. Rouse was not permitted to work those shifts, despite his requests to do so.

42. As part of Life Alert's purported "investigation" into Mr. Rouse's claims, Kelly Jeffers, another Black employee at Life Alert, was interviewed.

43. Shortly after that interview, Mr. Jeffers left the company; on information and belief, Life Alert terminated Mr. Jeffers' employment.

44. Around the same time, Life Alert also terminated an employee known only to Mr. Rouse as "Barry"; Barry was the only other African-American employee in Mr. Rouse's department after Mr. Jeffers left Life Alert.

45. Mr. Rouse participated in another meeting with Life Alert's management on or about March 21, 2016, concerning his complaint of race discrimination.

46. During this meeting, Life Alert informed Mr. Rouse that the investigation had concluded and that no action would be taken.

47. After this meeting, Life Alert began fabricating reasons to criticize Mr. Rouse's performance. For example, Life Alert criticized the number of leads that Mr. Rouse had contacted. When Mr. Rouse pointed out that he had received fewer and worse leads after his complaints of race discrimination, Life Alert did not offer any response.

48. On or about April 1, 2016, Life Alert terminated Mr. Rouse without explanation. Mr. Rouse asked Life Alert to to explain why his employment was being terminated, but Life Alert refused to provide any explanation.

49. To date, Mr. Rouse still has not received the commissions on sales that he had earned at the time of his termination.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Hostile Work Environment in Violation of Section 1981

50. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 49 with the same force as though separately alleged herein.

51. Section 1981 prohibits employers from discriminating against an employee in compensation, terms, conditions or privileges of employment on the basis of race.

52. Defendant discriminated against Plaintiff by treating him less well than white employees and subjecting him to offensive, racially motivated comments that were so severe and pervasive that they altered the terms, conditions, or privileges of his employment.

53. As a direct and proximate consequence of Defendant's race discrimination, Plaintiff has suffered, and continues to suffer, substantial economic damages, including, but not limited to, back pay and front pay, as well as emotional distress and suffering.

54. Defendant's discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's federally protected rights.  Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

### SECOND CAUSE OF ACTION
### Retaliation in Violation of Section 1981

55. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 54 with the same force as though separately alleged herein.

56. Section 1981 prohibits employers from retaliating against any employee for making a complaint of racial discrimination.

57. Plaintiff properly complained to Defendant about racial discriminators' comments and conduct.

58. Defendant retaliated against Plaintiff by, *inter alia*, subjecting him to further offensive, racially motivated harassment, refusing to reprimand the discriminatory behavior, and ultimately terminating his employment.

59. As a direct and proximate consequence of Defendant's retaliation, Plaintiff has suffered, and continues to suffer, substantial economic and non-economic damages, including, but not limited to, back pay and front pay, as well as emotional distress and suffering, all in amounts to be determined at trial.

60. Defendant's discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's federally protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## THIRD CAUSE OF ACTION
### Hostile Work Environment in Violation of the NYCHRL

61. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 60 with the same force as though separately alleged herein.

62. The NYCHRL prohibits employers from discriminating against an employee in compensation, terms, conditions or privileges of employment on the basis of race.

63. Defendant discriminated against Plaintiff by treating him less well than white employees and subjecting him to offensive, racially motivated comments that were so severe and pervasive that they altered the terms, conditions, or privileges of his employment.

64. As a direct and proximate consequence of Defendant's race discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering.

65. Defendant's discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

### FOURTH CAUSE OF ACTION
### Retaliation in Violation of the NYCHRL

66. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 65 with the same force as though separately alleged herein.

67. The NYCHRL prohibits an employer from retaliating against an employee for complaining of discriminatory practices illegal under the NYCHRL.

68. Plaintiff properly complained to Defendant about racial discriminators' comments and conduct.

69. Defendant retaliated against Plaintiff by, *inter alia*, subjecting him to further offensive, racially motivated harassment, refusing to reprimand the discriminatory behavior, and ultimately terminating his employment.

70. As a direct and proximate consequence of Defendant's retaliation, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering.

71. Defendant's retaliation toward Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

### FIFTH CAUSE OF ACTION
### Unpaid Commissions in Violation of the FLSA

72. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 71 with the same force as though separately alleged herein.

73. At all relevant times, Plaintiff was an "employee" and Defendant was an "employer" as contemplated under the FLSA.

74. Defendant, upon information and belief, received more than $500,000 in gross revenue per year.

75. The FLSA mandates that employers must compensate employees for all commissions earned.

76. Defendant willfully violated the requirements of the FLSA by unlawfully withholding Plaintiff's earned commissions.

77. As a result of Defendant's unlawful acts, Plaintiff has been deprived of wages and overtime compensation in an amount to be determined at trial and is entitled to recovery of liquidated damages, interest, attorneys' fees, costs, and disbursements of the action.

## SIXTH CAUSE OF ACTION
### Unpaid Commissions in Violation of the NYLL

78. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 77 with the same force as though separately alleged herein.

79. At all relevant times, Plaintiff was an "employee" and Defendant was an "employer" as contemplated under the NYLL.

80. The NYLL mandates that employers must compensate employees for all commissions earned.

81. Defendant willfully violated the requirements of the NYLL by unlawfully withholding Plaintiff's earned commissions.

82. As a result of Defendant's unlawful acts, Plaintiff has been deprived of wages and overtime compensation in an amount to be determined at trial, and is entitled to recovery of liquidated damages, interest, attorneys' fees, costs, and disbursements of the action.

**Request for Relief**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first claim, actual damages to be determined at trial, but in no event less than $250,000;

B. For the second claim, actual damages to be determined at trial, but in no event less than $250,000;

C. For the third claim, actual damages to be determined at trial, but in no event less than $250,000;

D. For the fourth claim, actual damages to be determined at trial, but in no event less than $250,000;

E. For the fifth claim, damages to be determined at trial;

F. For the sixth claim, damages to be determined at trial; and

G. An award of compensatory, assumed, and punitive damages;

H. Pre-judgment and post-judgment interest;

I. Attorneys' fees and costs; and

J. For such other and further relief as the Court deems just and proper.

Dated:   New York, New York
August 16, 2016

By: _____
Walker G. Harman, Jr. [WH-8044]
Owen H. Laird [OL-6994]
THE HARMAN FIRM, LLP
220 Fifth Avenue, Suite 900
New York, NY 10001
(212) 425-2600
wharman@theharmanfirm.com
olaird@theharmanfirm.com
*Attorneys for Plaintiff*